DANIEL J. BERGESON
Bar No. 105439
dbergeson@be-law.com
MELINDA M. MORTON
Bar No. 209373
mmorton@be-law.com
BERGESON, LLP
303 Almaden Boulevard
Suite 500
San Jose, CA 95110-2712
Telephone:(408) 291-6200
Facsimile:(408) 297-6000

R. TERRANCE RADER, Esq.
*(Pro Hac Vice)*
rtr@raderfishman.com
RADER, FISHMAN & GRAUER PLLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone:(248) 594-0600
Facsimile:(248) 594-0610

*Attorneys for Plaintiff Semiconductor*
*Energy Laboratory Co., LTD.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| SEMICONDUCTOR ENERGY LABORATORY CO., LTD <br><br>     *Plaintiff*, <br><br>   vs. <br><br> YUJIRO NAGATA, <br><br>     *Defendant.* | )<br>)<br>) Civil Action No. C 11-02793 CRB<br>) U.S. District Judge Charles R. Breyer<br>)<br>) **FIRST AMENDED COMPLAINT FOR**<br>) **DECLARATORY AND OTHER RELIEF**<br>)<br>)<br>) |

    Plaintiff Semiconductor Energy Laboratory Co., Ltd., for its First Amended Complaint against Defendant Yujiro Nagata, alleges:

## PARTIES

    1.    Plaintiff Semiconductor Energy Laboratory Co., Ltd. ("SEL") is a Japanese corporation with its principal place of business at 398 Hase, Atsugi-shi, Kanagawa, 243-0036, Japan.

2.      Upon information and belief, Defendant Yujiro Nagata ("Dr. Nagata") is a Japanese citizen who has resided at 4-17-8, Kamiasao, Asao-ku, Kawasaki-shi, Kanagawa 215-0021, Japan, and conducted business with persons and/or entities located in the United States of America.

## JURISDICTION AND VENUE

3.      This action arises under, *inter alia*, the Patent Laws of the United States, 35 U.S.C. §§ 1 *et seq*., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

4.      The Court has original subject matter jurisdiction under 28 U.S.C. §1338(a) as a civil action arising under any Act of Congress relating to patents and has supplemental jurisdiction over other claims under 28 U.S.C. §1367.

5.      The Court has original subject matter jurisdiction under 28 U.S.C. §§2201(a) and 2202 in that there exists, between Plaintiff SEL and Defendant Dr. Nagata, an actual, substantial, and continuing justiciable case or controversy that is within the Court's jurisdiction.

6.      The amount in controversy exceeds $75,000, exclusive of interest and costs.

7.      Upon information and belief, venue is proper under 28 U.S.C. §1391(b) and (d) for at least the reasons that: (a) Defendant purposely availed himself of this judicial district by residing and working here over a period of several years; (b) a substantial part of the events or omissions giving rise to SEL's claims occurred here; and (c) the Defendant is an alien who can be sued in any judicial district.

8.      Upon information and belief, the Court has personal jurisdiction over the Defendant, including but not limited to, under the California Long-Arm Statute, *Cal. Code Civ. Proc* §410.10,  for at least the reasons that at relevant times, Defendant conducted relevant business in the United States (including the State of California);  Defendant purposely availed himself of the laws of the United States;  a substantial part of the Defendant's acts or omissions giving rise to SEL's claims occurred here; and at least a portion of the injury suffered by SEL occurred here.

///

FIRST AMENDED COMPLAINT                                                                 C11-02793 CRB

**NATURE OF THE CASE**

9.      This action relates generally to the enforceability of U.S. Patent No. 6,900,463, titled "Semiconductor Device," which was duly and properly issued by the U.S. Patent and Trademark Office ("USPTO") on May 31, 2005 (the "'463 Patent."), as well as to the effects of Defendant Dr. Nagata's wrongful conduct on other U.S. Patents related to the '463 Patent, all of which are owned by SEL.  As more fully described herein, years after he was paid in full for his inventive work and for the contractual assignment of his patent rights to SEL, Dr. Nagata engaged in wrongful conduct that repudiated his patent assignment contracts in violation of United States patent law.  Dr. Nagata's repudiation occurred shortly after SEL told Dr. Nagata to cease his four year campaign to extract additional money from SEL for the patent rights he had contractually assigned years earlier.  At the time of Dr. Nagata's repudiation, SEL was asserting a patent in the family that Dr. Nagata had worked on in litigation against a third party, Samsung Electronics Co. Ltd. ("Samsung"), and other defendants.  Although Dr. Nagata had previously assisted SEL in patent litigation (for additional compensation), Dr. Nagata refused to assist in the *Samsung* litigation.  Instead, after SEL rebuffed his unwarranted demands for extra-contractual payment, Dr. Nagata decided to generate extra money from the patent litigation in a different way – by assisting Samsung in undermining the same patent family that he had assigned to SEL and for which he had been paid many years earlier.  In doing so, Dr. Nagata breached his patent assignment contract, violated Federal patent law prohibiting an inventor from undermining his own patent, and cast a cloud over the enforceability of the valuable patents he sold to SEL.

10.      Despite being named as a co-inventor on the '463 Patent, Dr. Nagata has engaged in a course of wrongful conduct which baselessly impugned the enforceability of the '463 Patent, causing substantial injury and damage to Plaintiff, SEL.  Upon information and belief, Dr. Nagata's conduct was willful, deliberate, and calculated to inflict substantial damage to SEL, while providing substantial financial benefit to Dr. Nagata. This action seeks declaratory and other relief and redress related to Dr. Nagata's wrongful conduct, which unnecessarily raised questions concerning the enforceability of Plaintiff's '463 Patent and which continue to affect the value of that patent.

**GENERAL ALLEGATIONS**

11.     SEL is the owner of many U.S. and foreign patents relating to the field of electronics, and more specifically, the field of semiconductors.  It has been reported that in 2010, SEL ranked 36th among the top 50 U.S. patent assignees, with 734 patents assigned in 2010.

12.     SEL was founded by Dr. Shunpei Yamazaki, who is also its President.  Dr. Yamazaki is one of the world's most prolific inventors, being a named inventor on thousands of U.S. and foreign patents in the electronics field, including many patents considered to be pioneering in their field.

13.     The USPTO database indicates that compared to thousands of patents naming Dr. Yamazaki as an inventor, only seven U.S. patents (not including one reissue of an earlier issued patent) name Dr. Nagata as an inventor.  In each of the seven cases, Dr. Nagata is named as a co-inventor, only, with Dr. Yamazaki named as the lead inventor.

14.     Among the patents naming Dr. Yamazaki and Dr. Nagata as inventors are U.S. Patent No. 5,091,334 (the "'334 Patent") and the principal patent at issue, the '463 Patent.

15.     Although also claiming priority to earlier filed applications, the '334 Patent arises from U.S. patent application serial number 07/488,102, filed March 5, 1990 (the "'102 Application"). Similarly, although also claiming priority to earlier filed applications, the '463 Patent arises from U.S. patent application serial number 08/104,264, filed Sept. 8, 1992 (the "'264 Application").

16.     Dr. Yamazaki's work related to the patented technology dates back to at least 1979. In July 1979, Dr. Yamazaki filed U.S. patent application serial number 06/058,077, one of his first U.S. patent applications, which resulted in the issuance of U.S. Patent No. 4,239,554 on December 16, 1980 (the "Yamazaki '554 Patent"), with Dr. Yamazaki as the sole inventor.

17.     At about that time, Dr. Yamazaki began to conduct some of his research in warehouse space at Aoyama Gakuin University in Japan ("the University".)

18.     Also in about the 1979-80 timeframe, Dr. Yamazaki was introduced by a professional acquaintance to Defendant Dr. Nagata, who at that time was working as part-time research associate at the University.  Subsequently, Dr. Yamazaki, and SEL when formed, hired

4

Dr. Nagata as an assistant for certain research and regularly paid Dr. Nagata for his employment until sometime in 1982. After that Dr. Nagata continued as an employee of the University.

19.     On June 30, 1980, Japanese patent application number 55-088974, to which the '463 patent claims priority, was filed.  That Japanese patent application named Dr. Yamazaki and Dr. Nagata as co-inventors.

20.     On July 1, 1980, SEL was established.

21.     On February 24, 1981, Dr.  Yamazaki filed U.S. patent application 06/237,609 in the United States.  This application claimed priority to Japanese patent application number 55-026388 and named Dr. Yamazaki as the sole inventor.  The application resulted in issuance of U.S. Patent No. 4,409,134 (the "'134 Patent") to Dr. Yamazaki on October 11, 1983.

22.     Dr. Yamazaki's continuing work, including some work in which Dr. Nagata assisted Dr. Yamazaki, resulted in several additional patent applications being filed in the United States that also named Dr. Nagata as a co-inventor. Eventually, seven U.S. patents issued which also named Dr. Yamazaki and Dr. Nagata as co-inventors. Among the seven patents are the '334 Patent and '463 Patent.

23.     For example, the face of the '463 Patent shows the progression among patent applications that ended in issuance of the '463 Patent:

**Related U.S. Application Data**

(63)   Continuation of application No. 07/601,437, filed on Oct. 23, 1990, now abandoned, which is a continuation of application No. 07/488,102, filed on Mar. 5, 1990, now Pat. No. 5,091,334, which is a division of application No. 07/098, 705, filed on Sep. 18, 1987, now abandoned, which is a continuation of application No. 06/775,767, filed on Sep. 13, 1985, now abandoned, which is a division of application No. 06/278,418, filed on Jun. 29, 1981, now Pat. No. 4,581,620, which is a continuation-in-part of application No. 06/237, 609, filed on Feb. 24, 1981, now Pat. No. 4,409,134.

(30)     **Foreign Application Priority Data**

Jun. 30, 1980     (JP) ............................................. 55-88974

24.     As indicated, the first two patent applications in the chain of priority for the '463 Patent are Japanese patent application No. 55-88974 and Dr. Yamazaki's U.S. patent application No. 06/237,609, which resulted in his '134 Patent.

FIRST AMENDED COMPLAINT                                                    C11-02793 CRB

25.     Next in the chain was U.S. patent application No. 06/278,418, which was filed on June 29, 1981 and resulted in the issuance of U.S. Patent No. 4,581,620 (the "'620 Patent"). As a "continuation-in-part," this application added new matter over previous applications, thus building on Dr. Yamazaki's earlier work. This application was the first U.S. application in the chain of priority for the '463 Patent in which Dr. Nagata was named as a co-inventor with Dr. Yamazaki, in recognition of Dr. Nagata's assistance to Dr. Yamazaki that contributed to subject matter claimed in the '620 Patent.

26.     All subsequent applications in the chain of priority of the '463 Patent were divisional or continuation applications, meaning that they contained no new matter beyond U.S. patent application No. 06/278,418, the first application in which Dr. Nagata was named as a co-inventor with Dr. Yamazaki.

27.     There is no known dispute of the fact that Dr. Nagata originally signed all necessary Declarations and/or Assignments related to the U.S. patent applications in the chain of priority of the '463 Patent in which Dr. Nagata was named as a co-inventor along with Dr. Yamazaki.

28.     For example, on June 25, 1981, Dr. Nagata signed a Declaration and Power of Attorney in connection with a parent application for the '264 Application which gave rise to the '463 Patent. On the same date, Dr. Nagata assigned, in writing, all of his rights and interest in the invention described in the same parent application to Dr. Yamazaki. Dr. Nagata's assignment applied to the parent application and to all "divisions, reissues, continuations and extensions thereof, and in and to any Letters Patent that may be granted thereon..." Thus, Dr. Nagata's assignment also applied to the '463 Patent, which claimed priority to the parent application. There is no genuine dispute that Dr. Nagata's signature on his June 25, 1981 Declaration and Assignment are authentic.

29.     The '264 Application, which gave rise to the '463 Patent at issue, was the last U.S. patent application on which Dr. Nagata was named as a co-inventor with Dr. Yamazaki.

30.     One of the applications in the chain of priority for the '463 Patent is U.S. patent application No. 07/601,437, filed October 23, 1990 (the "'437 Application."). Along with the

'102 Application, the '437 Application is "upstream" in the chain of priority of the '463 Patent.

31.     During the prosecution of the '437 Application, the U.S. Patent Examiner rejected the application as anticipated by the Yamazaki '554 Patent, discussed in Para. 16 above. In that regard, the Examiner issued specific instructions in order for the '437 Application to have priority to an earlier application and permit the Yamazaki '554 Patent to be removed as a cited reference.

32.     The Examiner's instructions required small changes in the descriptions of relationships among patent applications up the chain of priority from the '437 Application.   These changes in turn required adjustment in the language of certain Declarations, including a Declaration for the '102 Application, from which the '437 Application claimed priority.

33.     Thus, in 1991, it became necessary to obtain Dr. Nagata's signature on an additional Declaration and Assignments that related to the then-pending '102 Application, which eventually gave rise to the '334 Patent and to which the '437 Application claimed priority.

34.     Dr. Yamazaki specifically recalls traveling on September 30, 1991 to the University to obtain Dr. Nagata's signature on a substitute Declaration and Assignment related to the '102 Application.  After his employment with Dr. Yamazaki and/or SEL ended, Dr. Nagata continued as an employee of the University.  On information and belief, Dr. Nagata benefited from grants and other monies paid to the University by SEL.  Moreover, on information and belief, Dr. Nagata's employability and reputation were substantially enhanced by his association with Dr. Yamazaki and/or SEL.

35.     Dr. Yamazaki specifically recalls that on September 30, 1991, Dr. Yamazaki traveled to the University by car with his wife in order to meet Dr. Nagata in his laboratory.  In that regard, Dr. Yamazaki specifically recalls: (a) observing Dr. Nagata sign the declaration and assignment related to the '102 Application while bending his upper body low over a table which was about 45 cm high; (b) pointing out to Dr. Nagata that his signature style had change; (c) hearing Dr. Nagata state why his signature had changed and observing him practicing his signature several times before signing the documents of interest.  Dr. Yamazaki's recollection of the event of Dr. Nagata's signature of the September 30, 1991 documents is supported by at least the recollections of Dr. Yamazaki's wife, related road toll receipts, a contemporaneous store receipt

obtained on the same date by Dr. Yamazaki's wife, and a university campus map, as well as the signed documents themselves.

36.     Later in 1991, it became necessary to obtain Dr. Nagata's signature on a substitute Assignment after the September 1991 Assignment had been rejected by the USPTO due to inappropriate form.  Dr. Yamazaki specifically recalls obtaining Dr. Nagata's signature on the December 11, 1991 Assignment.  Dr. Yamazaki's recollection is supported by substantial corroborating evidence, including but not limited to, records of Dr. Yamazaki's trips and activities on December 11, 1991.

37.     The substitute Declaration and Assignments for the '102 Application that Dr. Nagata signed in September and December 1991 never became part of the file history for the separate '264 Application which gave rise to the '463 Patent.

38.     In June 2002, SEL filed a patent infringement lawsuit in the United States against ACER and AUO.  In the same month, SEL met with Dr. Nagata to obtain his cooperation in providing information about one of the patents at issue, which named Dr. Nagata as a co-inventor, as well as in searching for documents related to the litigation.

39.     In February 2004, after the ACER litigation had settled, SEL paid Dr. Nagata 6,125,000 yen (about $76,000) in appreciation for Dr. Nagata's cooperation and services related to the document search for the ACER case.  During this time period, Dr. Nagata never raised any issue concerning patent title or assignment of rights for any patent or patent application on which he was named as a co-inventor with Dr. Yamazaki.

40.      However, beginning as early as March 2004, Dr. Nagata began a series of contacts and communications with SEL and Dr. Yamazaki in which Dr. Nagata demanded additional compensation relating to patents on which Dr. Nagata was a named inventor.  In brief, Dr. Nagata insisted on more payment for his role as a co-inventor, even though he had previously assigned all of his rights in the related patents and applications. Because it had no obligation to do so, SEL declined to meet Dr. Nagata's demands.

41.     Over time, Dr. Nagata's demands became increasingly specific and urgent, with Dr. Nagata demanding compensation of 10 million to 20 million yen (between approximately

$125,000 to $250,000, depending on the applicable currency conversion rate.)  These communications from Dr. Nagata continued well into 2008, when SEL through its counsel was forced to ask Dr. Nagata to halt his disruptive contacts with SEL personnel.

42.     Less than a year later, on January 2, 2009, SEL filed a patent infringement lawsuit in the United States District Court for the Western District of Wisconsin against Samsung Electronics Co. Ltd. ("Samsung") and other defendants.

43.     Because the *Samsung* litigation implicated patents, including the '463 Patent, on which Dr. Nagata was a named inventor, SEL met and communicated with Dr. Nagata in October 2009 in connection with the *Samsung* litigation.  SEL presumed that, as a co-inventor, Dr. Nagata would cooperate with SEL as he had previously done in connection with the ACER litigation.

44.     To the contrary, on December 15, 2009, SEL learned that Dr. Nagata had agreed to assist Samsung in the litigation, not as a fact witness, but as a paid consultant for the U.S. law firm defending Samsung. In this capacity, Dr. Nagata raised questions for the first time about the invalidity or unenforceability of the '463 Patent, on which Dr. Nagata was a co-inventor.

45.     SEL subsequently learned that Dr. Nagata had repudiated his signature of the substitute Declaration and Assignments that Dr. Nagata signed eighteen years earlier in 1991.  Dr. Nagata's repudiation came to SEL's attention in part by means of declarations signed by Dr. Nagata and filed with the U.S. District Court in Wisconsin.

46.     It was also later revealed that Dr. Nagata was to receive a guaranteed minimum payment of $52,500 regardless of the number of hours he "worked," with additional compensation at the rate of $350.00 per hour.  With this guaranteed fee at hand, and despite having known Dr. Yamazaki for almost twenty years, Dr. Nagata sought for the first time to impugn the enforceability of SEL's '463 Patent.

47.     Documents disclosed in the *Samsung* litigation showed that Dr. Nagata was residing in the State of California during the same time period, even holding a California driver's license and a U.S. Social Security card and number, and met with Samsung's attorneys in California on multiple occasions.

48.     In the *Samsung* litigation, Samsung asserted that the '463 Patent was unenforceable

9

1  due to alleged inequitable conduct not based in the prosecution of the '463 Patent, but instead in

2  the prosecution of the '102 Application, to which the '463 Patent claims priority.

3          49.     In the Wisconsin litigation, Samsung asserted that Dr. Nagata's repudiation of the

4  signatures required by his assignment contract constituted evidence of forgeries which rendered

5  the related patents, including the '463 Patent, unenforceable due to alleged inequitable conduct.

6  As evidence of Dr. Nagata's repudiation, Samsung filed Declarations signed by Dr. Nagata in the

7  U.S. District Court in Wisconsin.  Upon information and belief, Samsung also relied heavily on

8  other statements by Dr. Nagata in which Dr. Nagata refused to admit that he signed the September

9  and December 1991 substitute Declaration and Assignments for the '102 Application, as

10  witnessed by Dr. Yamazaki.  Instead, Dr. Nagata collaborated with Samsung's counsel by

11  allowing Samsung to use Dr. Nagata's repudiation to impugn the enforceability of the asserted

12  patents, an action that seems very unlikely if SEL had given in to Dr. Nagata's 2004 to 2008

13  demands to pay him additional monies in connection with his historic work on the patents.

14          50.     Dr. Nagata's prejudicial conduct is exacerbated by the fact that Dr. Nagata admitted

15  that he signed essentially identical declarations and assignments for two patents in the same family

16  and with the same specification as the '463 patent in 1981, 1994, and 1996, leaving unanswered

17  the questions of why Dr. Nagata would have signed patent-related documents in 1981, 1994, and

18  1996, but not in 1991, as Dr. Yamazaki recalls.

19          51.     The 1994 document, which Dr. Nagata admits signing, belies Dr. Nagata's

20  wrongful repudiation of the 1991 documents because the document sets out Dr. Nagata's

21  understanding of the circumstances which led to his signature of the 1991 documents in

22  connection with the prosecution of the '437 application, as witnessed by Dr. Yamazaki.

23          52.     In attempting to cast doubt on his execution of those documents, Dr. Nagata

24  disclosed that he had been suffering a severe back injury that eventually required an extended

25  hospital stay in Japan.  However, there is no indication that Dr. Nagata was hospitalized on the

26  dates that Dr. Yamazaki recalls meeting with Dr. Nagata in order to obtain his signatures on the

27  necessary documents.  While Dr. Nagata's purported back injury might have contributed to the

28  quality of his cursive signature on the executed documents, there is no indication that his medical

1  treatment made him unavailable to execute the documents, as Dr. Yamazaki recalled.

2        53.     The Wisconsin federal court hearing the *Samsung* litigation declined in May 2010

3  to grant relief to Samsung on its inequitable conduct allegations, and the litigation subsequently

4  settled.

5        54.     Nonetheless, Dr. Nagata's conduct caused serious injury to SEL and to its patent

6  portfolio, and SEL accordingly seeks relief from this Court for those injuries.

7        55.     Dr. Nagata's repudiation of his earlier signatures required by his contractual

8  assignment has and continues to have severe effects on SEL and its related patents. Dr. Nagata's

9  repudiation of his contractually-required signatures raised, and continues to raise, a cloud on the

10 ownership, enforceability, and validity of SEL's patent family, which dramatically undermines the

11 value of the associated patent rights and potential licensing revenue.

12      56.     As a named inventor signing a Declaration, Dr. Nagata is barred by federal law

13 from disputing the validity of the related patents. Dr. Nagata's repudiation of his signatures raised

14 questions for the first time about the invalidity or unenforceability of the '463 Patent, on which

15 Dr. Nagata was a co-inventor, as well as other related patents.

16      57.     As a result of his wrongful conduct in challenging the enforceability of the '463

17 Patent, Dr. Nagata caused SEL to settle its claims against Samsung for remuneration that was

18 much less than it would have been had Dr. Nagata not have impugned the enforceability of the

19 Patent. By contrast, before Dr. Nagata made (and SEL rejected) his 2004 to 2008 demands for

20 additional monies, he never challenged or assisted others in challenging any aspect of the patents

21 and in fact assisted SEL in earlier patent litigation.

22      58.     Upon information and belief, future enforcement of SEL's rights in the '463 Patent

23 has now been impaired by the record of Dr. Nagata's adversarial involvement in the *Samsung*

24 litigation for which Dr. Nagata was paid over $52,000 in guaranteed compensation, no matter how

25 much time he spent on the matter. It is apparent that Dr. Nagata can and may even be considered

26 likely to offer his "consulting" services to future defendants, extracting exorbitant guaranteed

27 minimum fees in exchange for his services in impugning and undermining the SEL patents.

28      59.     Dr. Nagata's wrongful actions and words falsely called into question SEL's

legitimate rights to enforce its patents, including but not limited to, the '463 Patent.

60.     Dr. Nagata's malice is evidenced by substantial evidence, including but not limited to: (a) his long delay in asserting his alleged rights to additional compensation from SEL; (b) his increasingly strident attempts to compel SEL to pay him monies that he was not owed from 2004 to 2008 for patent rights that he had assigned in 1981; and  (c) his willingness quickly to provide damaging testimony against SEL's patent rights in exchange for an exorbitant guaranteed minimum payment after SEL refused to pay his demands.

61.     Upon information and belief, Dr. Nagata's conduct has caused substantial damage to SEL, including but not limited to: (a) the estimated difference in value between the settlement with and without Dr. Nagata's involvement, potentially measured as millions of dollars, and (b) attorneys' fees, expert expenses, and other costs and expenses associated with rebutting Dr. Nagata's testimony.

62.     Upon information and belief, Dr. Nagata has benefited substantially as a result of his wrongful conduct, including but not limited to, through his receipt of a guaranteed minimum payment in excess of $52,000.

63.     Relief from Dr. Nagata's wrongful conduct necessarily depends on the resolution of one or more substantial questions of federal patent law, resolution of which is essential to each of the claims herein.

## COUNT 1

### DECLARATORY JUDGMENT -
### VIOLATION OF FEDERAL PATENT LAW

64.     SEL hereby incorporates and realleges Paragraphs 1 through 63 above as though fully set forth herein.

65.     Federal law bars an assignor of a U.S. Patent from conduct that attacks the U.S. Patent subject to that assignment on grounds of invalidity or inequitable conduct.

66.     In September 1991 and again in December 1991, Dr. Nagata signed Assignments and other documents related to the patents at issue.  Dr. Nagata intentionally relinquished any right to attack the enforceability of the patents subject to his assignment by virtue of Federal patent law

12

estopping such attacks.

67.    Subsequently, Dr. Nagata repudiated his signed Assignments, and upon information and belief, his repudiation continues to date.

68.    Upon information and belief, Dr. Nagata undertook his repudiation for his own personal financial gain in conjunction with an accused infringer, Samsung, and/or Samsung's agents and representatives, with whom Dr. Nagata was in privity and who stood in a position to benefit substantially from Dr. Nagata's repudiation in violation of Federal patent law.

69.    Upon information and belief, at the time of his repudiation, Dr. Nagata knew or should have known that his repudiation was or would be used to impugn the validity and enforceability of one or more U.S. Patents assigned by Dr. Nagata and owned by SEL, including but not limited to, the '463 Patent.

70.    Upon information and belief, Dr. Nagata has created substantial legal and other uncertainty that impairs SEL's ability to use or enforce its related patents.

71.    This uncertainty and impairment of SEL's rights are, alone or in combination, sufficiently concrete and cognizable injuries-in-fact that are fairly traceable to Dr. Nagata and that can be redressed only by a declaratory judgment from this Court.

72.    Relief from Dr. Nagata's wrongful conduct necessarily depends on the resolution of one or more substantial questions of Federal patent law, resolution of which is essential to each of the claims herein.

73.    Accordingly, there is an actual, substantial, and continuing justiciable case and controversy between SEL and Dr. Nagata concerning his violation of Federal patent law, over which this Court can and should exercise jurisdiction and declare the rights of the parties.

74.    SEL is entitled to a judicial declaration that Dr. Nagata has violated Federal patent law by repudiating one or more or his assignments related to patents at issue.

75.    The Court should grant SEL all further necessary and proper relief as a result of Dr. Nagata's conduct in violation of Federal patent law, including but not limited, awarding SEL all damages suffered by SEL as a result of Dr. Nagata's wrongful conduct.

///

**COUNT 2**

**DECLARATORY JUDGMENT -**
**ANTICIPATORY BREACH OF CONTRACT**

76.     SEL hereby incorporates and realleges Paragraphs 1 through 75 above as though fully set forth herein.

77.     The Assignments signed by Dr. Nagata in September 1991 and December 1991 are valid contracts of patent assignment under which Dr. Nagata agreed, *inter alia*, to transfer all of his right, title, and interest in the subject intellectual property to SEL.

78.     As only one example, under the December 1991 contract of patent assignment, Dr. Nagata agreed "...to perform all affirmative acts which may be necessary to obtain a grant of a valid United States patent(s) to [SEL] and to vest all rights therein hereby conveyed to [SEL] as fully and entirely as the same would have been held by [Dr. Nagata] if this Assignment and sale had not been made."

79.     The Assignments are clearly intended to be permanent and irrevocable, which means that Dr. Nagata had and has an ongoing obligation not to repudiate, challenge, undermine or otherwise cast doubt on the validity and effectiveness of those Assignments.

80.     By repudiating his Assignments, Dr. Nagata has *de facto* denied that he has any obligation to SEL under his contracts of patent assignment, including but not limited to, his obligation to permanently vest in SEL all right, title, and interest in the intellectual property subject thereto.

81.     Dr. Nagata's repudiation of his Assignments leaves SEL with substantial and unacceptable uncertainty as to Dr. Nagata's performance under his contracts of patent assignment and constitutes an anticipatory breach of contract. At a minimum, Dr. Nagata's previous conduct in obtaining payment from a defendant in SEL patent litigation and denying the authenticity of his signatures on the Assignments has proven a propensity toward future conduct to repudiate his patent assignments to SEL in any future enforcement action by SEL concerning infringements of that patent family.  Dr. Nagata's past conduct thus constitutes an anticipatory repudiation of his future and ongoing contract obligations regarding SEL's patent rights, casting great uncertainty on

14

the enforceability and value of SEL's patent rights.

82.     Accordingly, there is an actual, substantial, and continuing justiciable case and controversy between SEL and Dr. Nagata concerning his breach of his contracts of patent assignment, over which this Court can and should exercise jurisdiction and declare the rights of the parties.

83.     SEL is entitled to a judicial declaration that Dr. Nagata is in breach of his contracts of patent assignment by his repudiation of the same.

84.     The Court should grant SEL all further necessary and proper relief as a result of Dr. Nagata's breach of contract, including but not limited, awarding SEL all damages suffered by SEL as a result of Dr. Nagata's wrongful conduct.

**COUNT 3**

**<u>SLANDER OF TITLE</u>**

85.     SEL hereby incorporates and realleges Paragraphs 1 through 84 above as though fully set forth herein.

86.     By virtue of the contracts of patent assignment signed by Dr. Nagata, title to the subject intellectual property vested in SEL.

87.     As set out herein, by repudiating his Assignments, Dr. Nagata has *de facto* denied that he has any obligation to SEL under his contracts of patent assignment, including but not limited to, his obligation to permanently vest in SEL all right, title, and interest in the intellectual property subject thereto.

88.     Upon information and belief, Dr. Nagata's repudiation of his Assignments has impaired or wrongly called into question the ownership, enforceability, or value of the '463 Patent or other intellectual property owned by SEL.  Dr. Nagata's wrongful repudiation is evidenced by statements published by Dr. Nagata in the State of Wisconsin, including but not limited to, declarations executed by Dr. Nagata which evidence his wrongful repudiation and which were filed by Samsung in the U.S. District Court for the Western District of Wisconsin.  Those statements were false when made and were made by Dr. Nagata intentionally and maliciously in order to vex, injure, and/or annoy SEL.

89.     By wrongfully repudiating his Assignments, Dr. Nagata caused a slander on the title held by SEL in the subject intellectual property by virtue of the Assignments signed by Dr. Nagata.

90.     Upon information and belief, Dr. Nagata's wrongful conduct caused special damages to SEL, including but not limited to, the cost of the licensing differential caused by his unjustified and false attack on SEL's patent enforcement rights and uncertainty over the enforceability of SEL's patent title and patent rights that should have been permanently settled by Dr. Nagata's previous patent assignments.

**COUNT 4**

**QUIET TITLE**

91.     SEL hereby incorporates and realleges Paragraphs 1 through 90 above as though fully set forth herein.

92.     The '463 Patent was properly issued by the USPTO.

93.     Upon information and belief, Dr. Nagata's wrongful repudiation of his contracts of patent assignment has impugned SEL's ownership of the intellectual property subject to his Assignments.

94.     Upon information and belief, Dr. Nagata's conduct has wrongfully impugned the enforceability of the '463 Patent by raising issues of alleged inequitable conduct in the procurement of that Patent.

95.     While SEL does not believe that Dr. Nagata's conduct, including but not limited to, the content of his statements, ultimately bars the enforceability of the '463 Patent, relief from the Court is nonetheless necessary to cure the substantial cloud on the ownership or enforceability of the '463 Patent caused by Dr. Nagata's conduct, an uncertainty that, as already seen in the *Samsung* litigation, has very real costs in litigation and in settlement value.

96.     The Court should declare that SEL is owner of the intellectual property subject to Dr. Nagata's September 1991 and December 1991 Assignments.

97.     The Court should compel Dr. Nagata to appear and either to establish his claim of alleged inequitable conduct, or be forever estopped from asserting, or assisting in asserting,  any

16

1    alleged inequitable conduct relating to the '463 Patent.

2                               **COUNT 5**

3                          **UNJUST ENRICHMENT**

4           98.    SEL hereby incorporates and realleges Paragraphs 1 through 97 above as though

5    fully set forth herein.

6           99.    SEL conferred substantial benefit on Dr. Nagata in conjunction with the

7    procurement and maintenance of numerous U.S. and foreign patents naming Dr. Nagata as a co-

8    inventor along with Dr. Yamazaki.

9           100.   Upon information and belief, the benefits conferred on Dr. Nagata by SEL include,

10   but are not limited to, substantial enhancement of Dr. Nagata's employability and reputation;

11   benefits associated with monies paid to Dr. Nagata and/or to entities employing or affiliated with

12   him; and unintentional enhancement of Dr. Nagata's ability to benefit substantially by acting

13   adversely to SEL in conjunction with the enforcement of SEL patents naming Dr. Nagata as a co-

14   inventor.

15          101.   Dr. Nagata's wrongful repudiation of his contracts of patent assignment constitutes

16   breach of quasi-contract in that his assignments were permanent and irrevocable, thus giving rise

17   to at least an implied promise not to repudiate or challenge those assignments through any means,

18   including but not limited to, contesting his signature on those assignments.

19          102.   It is unjust and inequitable to permit Dr. Nagata to maintain the benefits conferred

20   on him by SEL.

21          103.   As a result of Dr. Nagata's wrongful conduct, SEL has been damaged in amounts

22   in excess of $75,000, exclusive of costs, interest, and attorneys fees.

23                          **PRAYER FOR RELIEF**

24          WHEREFORE, Plaintiff requests this honorable Court to enter judgment in its

25   favor:

26          a.     Declaring that Defendant has violated Federal patent law by repudiating

27   one or more of his Assignments related to the U.S. patents at issue;

28          b.     Barring Defendant from asserting, or assisting in asserting, any alleged

                                            17

1   inequitable conduct relating to the '463 Patent;

2        c.     Awarding damages to Plaintiff for the injuries caused by Defendant's

3   wrongful conduct and/or unjust enrichment in an amount in excess of $75,000;

4        d.     Awarding Plaintiff its costs and attorneys fees incurred in connection with

5   this action;

6        e.     Awarding Plaintiff reasonable punitive and/or exemplary damages against

7   Defendant for his wrongful acts; and

8        f.     Granting Plaintiff such other and further relief, including but not limited to,

9   equitable relief, as this Court may deem just and proper.

10                    **DEMAND FOR JURY TRIAL**

11        Plaintiff hereby demands trial by jury of all issues so triable.

12   Dated:  October 21, 2011            Respectfully submitted,

14                         /s/    Melinda M. Morton
DANIEL J. BERGESON, Bar No. 105439

15   dbergeson@be-law.com
MELINDA M. MORTON, Bar No. 209373

16   mmorton@be-law.com
BERGESON, LLP

17   303 Almaden Boulevard, Suite 500
San Jose, CA 95110-2712

18   Telephone:  (408) 291-6200
Facsimile:   (408) 297-6000

19

20   R. TERRANCE RADER, Esq., (*Pro Hac Vice*)
rtr@raderfishman.com

21   RADER, FISHMAN & GRAUER PLLC
39533 Woodward Ave., Suite 140

22   Bloomfield Hills, Michigan 48304
Telephone:  (248) 594-0600

23   Facsimile:   (248) 594-0610

24   Attorneys for Plaintiff

FIRST AMENDED COMPLAINT                         C11-02793 CRB